IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

**CARY MOORE MENZIE,**

  **Plaintiff,**

v.                Case No. 3:11cv416/MCR/CJK

**ANN TAYLOR RETAIL, INC.,**

  **Defendant.**

_____/

## ORDER

Plaintiff Cary Moore Menzie ("Menzie") filed this suit against her former employer, Ann Taylor Retail, Inc. ("Ann Taylor"), alleging employment discrimination on the basis of disability in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*, and the Florida Civil Rights Act ("FCRA"), Fla. Stat. § 760.10(1)(a).[1] Ann Taylor moves for summary final judgment on the claims (doc. 49). Having fully considered the arguments of the parties and the record, the court concludes that summary judgment should be granted.

**Background**[2]

On March 21, 2010, Ann Taylor, a retail clothing store, hired Menzie as a part-time sales lead to work in its in Pensacola, Florida, store, which at the time was managed by Eve Marcus and Carolyn Lang. Menzie resigned approximately one month later. At the

---

[1] Claims of disability discrimination under the ADA and the FCRA are analyzed under the same framework, thus the court will not separately address the claims under the FCRA. *See Chanda v. Engelhard/ICC*, 234 F.3d 1219, 1221 (11th Cir. 2000).

[2] For the limited purposes of this summary judgment proceeding, the court views "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party," which in this case is the plaintiff. *Martin v. Brevard County Pub. Sch.*, 543 F.3d 1261, 1265 (11th Cir. 2008) (internal marks omitted). The court is mindful that "what [are] considered to be the facts at the summary judgment stage may not turn out to be the actual facts if the case goes to trial." *Cottrell v. Caldwell*, 85 F.3d 1480, 1486 (11th Cir. 1996).

Case No. 3:11cv416/MCR/CJK

time, Menzie suffered from bipolar disorder and narcolepsy, for which she took medication and regularly saw a therapist. She did not inform Marcus or Lang of her disorders or medication during her interview. According to Menzie, she was frequently told she was doing well during her first month of employment, and although she complained of not getting much training, she stated in her deposition that she was always learning and being instructed on new tasks. She also testified that neither customers nor co-workers complained about her job performance, her sales were good, and she had no attendance problems.[3] Menzie admitted, however, in an April 6, 2010 journal entry that Lang had called her into her office to relay that a co-worker had expressed "concern and frustration" about her job performance. (Doc. 55-5, at 83; Menzie Depo. Exhibit 10).

At some point during her employment, Menzie informed Lang she was taking medication for her narcolepsy condition. Lang took a 10-day vacation in mid-April 2010, but before leaving, she told Menzie she was doing great. According to Menzie, while Lang was out on vacation, Menzie informed Marcus of her bipolar disorder and her need to take medication for it; Menzie told no one else about this condition and believes that this information changed management's perception of her.[4]

On Wednesday, April 21, 2010, when Lang returned from vacation, she called Menzie into her office to discuss complaints she had received about Menzie's performance. Lang and Menzie have differing accounts of this meeting, but for purposes of summary judgment, the court must accept Menzie's version as true. According to Menzie, she told Lang the complaints were untrue, and Lang then accused her of not remembering accurately due to her bipolar disorder. Menzie said Lang engaged in a verbal tirade for 45 minutes, berating Menzie with statements to the effect that she could not work in a managerial position because she believes bipolar people are deficient, flighty, dishonest,

---

[3] Ann Taylor disputes these assertions and submitted contrary evidence on this issue, discussed *infra*.

[4] According to Marcus, Menzie had told her at some point that she had narcolepsy, but Marcus denied that Menzie ever told her she was bipolar. Lang stated she was unaware of Menzie's bipolar disorder until Menzie informed her of it during a meeting on April 21, 2010.

Case No. 3:11cv416/MCR/CJK

and untrustworthy; and Lang called her a liar. Menzie recounted in her deposition that Lang explained how she never would have hired Menzie had she known she was bipolar and said Menzie should not be climbing on ladders in the store with narcolepsy because she could fall and cost the store money. Menzie said she was not allowed to see the complaints against her. In her personal journal, Menzie wrote that Lang said bipolar people do not make good managers because they are always "up and down." (Doc. 55-5, at 91). According to Menzie, Lang gave her the option of choosing to be demoted to a sales associate or staying on as a sales lead with the understanding that she had a 95% chance of being fired. She was given until Saturday, April 24, 2010, to decide. Menzie said she cried at hearing this tirade and stated in her deposition that she had been "stunned" and "flabbergasted" by this discriminatory "rant." (Doc. 53-1, at 31; Menzie Depo. at 198). Menzie also stated in her deposition that Lang then provided her the schedule for the following week and her hours had been reduced.[5] Menzie does not dispute Ann Taylor's assertion that all sales leads are part-time employees, and records confirm that Menzie's hours fluctuated in a manner similar to the hours of the other part-time sales leads.[6]

Menzie called a friend, Majenta Gallagher, to pick her up from work after her meeting with Lang on April 21st. Menzie told Gallagher what had happened, as well as her

---

[5] Records confirm, however, that the new schedule Lang provided during this meeting actually provided a slight increase in Menzie's scheduled work hours to 13.5 hours over the 12 hours she had been scheduled to work during the week of this incident. Menzie had testified in her deposition that her hours were reduced to 12 for the following week, but she submitted an affidavit to correct this statement, admitting she was in fact scheduled to work 13.5 hours the following week.

[6] Menzie's schedule shows she worked 25.5 hours during the week of March 21, 2010, then 22.75 hours during the week of March 28, 2010, and only 17 hours during the week of April 4, 2010. She was scheduled to work 28.5 hours the week of April 11, 2010, and only 12 hours during the week of April 18, 2010. This incident occurred on April 21, and Lang had scheduled Menzie to work 13.5 hours during the following week of April 25, 2010. The hours of other part-time sales leads varied each week as well, with their hours similarly ranging from 12.5 hours to 31.5 hours during this same time period, according to company time records and the affidavit of Linda Goodman, human resources manager for Ann Taylor. Menzie presented no evidence to rebut this.

Case No. 3:11cv416/MCR/CJK

parents and Carol Archie and John Mirra from Vocational Rehabilitation.[7] She also scheduled an emergency meeting on April 24, 2010, with her therapist, Dr. Shannon Wright-Johnson, whom Menzie said had advised her to quit because continuing this employment would be detrimental to her health; however, Menzie presented no affidavit from Dr. Wright-Johnson, only her own notes of the meeting in her in her personal journal. She also recorded in her journal that on April 24, 2010, she called in sick and did not go to work but advised Lang that she had decided to remain as a sales lead. Menzie testified contrary to this note in her deposition, insisting instead that she had told Lang she would take the sales associate position.[8] In either case, Menzie then changed her mind and quit.

Menzie was next scheduled to work on the afternoon of April 26, 2012, at which time she handed in her resignation, feeling that she could not work for Lang in light of her attitude about bipolar disorder. With her resignation, Menzie gave Lang a printed email, outlining her account of their meeting on April 21, 2010, titled Report of Disability Discrimination. Her account of the incident included the alleged statements by Lang about bipolar disorder but did not mention any reduction in hours. Lang referred the letter to the human resources department. Subsequently, an Ann Taylor human resources representative called Menzie to inquire into the situation. She asked what Menzie would like to see happen, and Menzie replied, "I said I would like for this to never happen again to anybody." (Doc. 53-1, at 42; Menzie Depo. at 211). Menzie said the representative

---

[7] The declarations of Gallagher (doc. 54-1, at 18-19), Archie (doc. 54-1, at 15-16), and Mirra (doc. 54-1, at 21) reflect what Menzie told them of the event. Gallagher said she told Menzie she should probably quit. Archie said she and Mirra advised Menzie to contact various advocacy centers for the disabled for additional advice. Archie stated she did not think Menzie would be treated fairly going forward in this employment. Mirra, who said Menzie reported that she was told she could either leave or take a demotion, stated he was shocked at the discrimination, and he advised her that he would help her find another job. Defendant argues that the court should disregard the affidavits because they are undated. In response, Plaintiff submitted emails to establish the approximate date and argues that undated third party declarations are admissible. The court finds that the dates of these declarations are sufficiently established by this extrinsic evidence.

[8] Lang said that Menzie had elected to remain in the sales lead position. There is no dispute that Lang offered Menzie the opportunity to stay in that job provided she showed some improvement in her job performance.

Case No. 3:11cv416/MCR/CJK

responded that there was nothing she could do for her. Menzie had already quit and was no longer an employee of Ann Taylor at that time.

According to Lang, Menzie had job performance issues throughout her five weeks of employment with Ann Taylor. Co-workers had complained, requiring Lang to counsel Menzie about her work performance on April 6, 2010, before Lang left on vacation; this meeting was referenced in Menzie's personal journal, though she disputes that she had any job performance issues. Lang was pleased to see Menzie's job performance improve briefly after this meeting, but by the time she returned from vacation, more complaints had been lodged by co-workers about Menzie's job performance. According to Lang, she then found it necessary give Menzie some options, such as continuing as a sales lead and making an attempt to improve her performance or accepting a demotion to a less-demanding sales associate position. Lang made it clear to Menzie that she could be terminated if her performance did not improve. In corroboration of Lang's testimony, Ann Taylor presented an email exchange between Lang and her district manager, Lisa Wright, dated April 19, 2010, two days before the April 21 meeting between Lang and Menzie. In this email, Lang informed Wright that she would be having a serious talk with "her new sales lead on Wednesday," which was the 21st. (Doc. 55-4, at 12). Lang said she had already spent considerable time coaching this person on how she might improve her performance and needed her advice on how to proceed. Wright responded the same day, informing Lang that she would have to "again" express her concerns to Menzie about her inability to do her job effectively and suggested Lang could encourage her to step down to a sales associate position "if you think she would be good at that." (*Id.* at 11). Wright stated, "otherwise, we need to manage her out of the business completely or get her to resign" (*id.*), which Lang understood to mean that she would have to begin documenting poor performance and corrective actions pursuant to company policies (doc. 55-4, at 5). Wright further explained, "[i]f she doesn't want to step down, then that's her decision but I would [be] clear with her that you need to see an immediate change to her performance as a sales lead." Wright also told Lang, "If you think she would be better at the sales

associate role, then simply tell her that and explain to her that you want her to be [a] success and feel good about coming to work." (*Id.*) These emails did not include any reference to Menzie's bipolar disorder and did not reference a reduction in her hours. Deposition testimony of co-workers also corroborates Lang's assertion that Menzie had job performance issues.

The record establishes that prior to, and during, Menzie's employment, Ann Taylor had in place a policy against discrimination set forth in a Store Associate Handbook, which was disseminated with a separate memorandum to new employees, who were required to confirm their receipt and review of it. The policy allows for reasonable accommodations based on disability, prohibits discrimination and harassment, and sets forth a procedure for employees to report discrimination or harassing behavior. Employees are instructed to contact a store manager, district manager, regional vice president, regional human resources manager, or director of human resources with their complaints. Ann Taylor presented evidence of Menzie's electronically signed initials on an acknowledgment form, dated prior to her first day of work, confirming she had received, read, and understood the policy, but Menzie denies any memory of either reading such a policy or signing an electronic form. It is undisputed that she made no complaint to the company consistent with the policy prior to resigning. However, she acknowledged in her deposition testimony that she was aware of such policies generally[9] and stated in a personal journal entry on April 24, 2010, before deciding to quit, that she had spent the day seeking advice from various vocational counselors, the Advocacy Center for Persons with Disabilities, the ACLU, the Human Rights Commission, and some lawyers, whom she wrote were not very helpful because she had not been fired yet.

After resigning, Menzie filed a charge of discrimination with the Equal Employment Opportunity Commission and the Florida Commission on Human Relations ("FCHR"), and was issued a notice of right to sue letter. Menzie then brought suit, claiming she suffered employment discrimination on the basis of her disability in violation of state and federal law,

---

[9] Menzie stated, "Well, I've seen policies before, so I recognize the verbiage." (Doc. 55-5, at 6).

Case No. 3:11cv416/MCR/CJK

and alleging Lang's discriminatory comments made her feel she had no choice but to resign. Ann Taylor has moved for summary judgment on grounds that, even acknowledging the existence of material facts with regard to the details of the incident that occurred between Lang and Menzie, there is no evidence to support Menzie's claim of discrimination.

**Discussion**

Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, "shows that there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Summary judgment is not appropriate "if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact." *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 594 (11th Cir. 1995). An issue of fact is "material" if it might affect the outcome of the case under the governing law, and it is "genuine" if the record taken as a whole could lead a rational fact finder to find for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 807 (11th Cir. 2010) (*en banc*). The court will not make credibility determinations or weigh the evidence presented on summary judgment. *Frederick v. Sprint/United Mgm't Co.*, 246 F.3d 1305, 1311 (11th Cir. 2001). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 247-49. Thus, to survive a motion for summary judgment, the nonmoving party must present more than "a mere 'scintilla' of evidence;" "'there must be enough of a showing that the jury could reasonably find for that party.'" *Brooks v. County Comm'n of Jefferson Cnty., Ala.*, 446 F.3d 1160, 1162 (11th Cir.2006) (*quoting Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir.1990)).

The ADA makes it unlawful to "discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or

discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."[10] 42 U.S.C. § 12112(a). To establish a *prima facie* case of employment disability discrimination, a plaintiff must demonstrate: (1) she has a disability; (2) she is a qualified individual, either with or without reasonable accommodations; and (3) she suffered unlawful discrimination in the terms or conditions of her employment because of her disability. *See Rossbach v. City of Miami*, 371 F.3d 1354, 1356–57 (11th Cir. 2004); *see also* 42 U.S.C. § 12112(a). Only the third element is at issue in this motion.[11] Viewing the record in the light most favorable to the plaintiff, she has presented direct evidence of a discriminatory intent based on her disability, but the court finds Menzie cannot demonstrate unlawful discrimination on this record, for reasons that follow.

Direct evidence is composed of "only the most blatant remarks, whose intent could be nothing other than to discriminate." *Carter v. City of Miami*, 870 F.2d 578, 582 (11th Cir. 1989). The statements plaintiff attributes to Lang are undoubtedly of this character, as Lang allegedly told Menzie that she could never be a manager because of her bipolar disorder and that she never would have hired Menzie had she known of her disorder. Lang was a decisionmaker and plaintiff's direct supervisor.

However, even claims involving direct evidence of discriminatory intent require the plaintiff also to show that she suffered an adverse employment action to support a claim of unlawful discrimination. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1230 n.34 (11th Cir. 2001), *cert. denied*, 534 U.S. 1127 (2002). Menzie alleges she was constructively discharged from her employment, which can qualify as an adverse employment action in discrimination suits. *See id.* at 1230 (discussing the ADEA); *see also*

---

[10] An ADA plaintiff alleging employment discrimination must satisfy the same type of evidentiary burdens demanded by similar employment discrimination statutes, thus the court finds Title VII cases to be instructive. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1365 (11th Cir. 2000); *Richio v. Miami-Dade Cnty.*, 163 F. Supp. 2d 1352, 1359 (S.D. Fla. 2001). Also, constructive discharge is analyzed the same under both the ADA and Title VII. *See Freeman v. Koch Foods of Ala.*, 777 F. Supp. 2d 1264, 1293 (M.D. Ala. 2011) (citing *Buckley v. Hosp. Corp. of Am., Inc.*, 758 F.2d 1525, 1530 (11th Cir. 1985)).

[11] Ann Taylor has not challenged whether the plaintiff has a disability nor has it questioned whether the plaintiff was qualified for her position.

Case No. 3:11cv416/MCR/CJK

*Atkinson v. Wiley Sanders Truck Lines, Inc.*, 45 F. Supp. 2d 1288, 1295 (M.D. Ala. 1998) ("Constructive discharge constitutes an adverse employment action under the ADA."), *aff'd* 189 F.3d 486 (11th Cir. 1999) (Table). "Constructive discharge occurs when an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit [her] job." *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009) (internal marks omitted), *cert. denied*, 130 S. Ct. 1536 (2010). Working conditions must be objectively "unbearable" such that "a reasonable person in that person's position would be compelled to resign." *Id.* (internal marks omitted). The Eleventh Circuit has commented that the standard for proving a constructive discharge is "more onerous" than that required to prove a hostile work environment.[12] *Hipp*, 252 F.3d at 1231. An adverse action must meet a "threshold level of substantiality," *Davis v. Town of Lake Park*, 245 F.3d 1232, 1238-39 (11th Cir. 2001), which the Eleventh Circuit has instructed "is quite high" for constructive discharge, *Hipp*, 252 F.3d at 1231. In assessing a constructive discharge claim, the court does not consider the plaintiff's subjective feelings about the employer's actions, but only whether a reasonable person in the plaintiff's position would be compelled to resign. *See Doe v. Dekalb Cnty. Sch. Dist.*, 145 F.3d 1441, 1450 (11th Cir. 1998); *Richio*, 163 F. Supp. 2d at 1367. "Generally speaking, 'isolated incidents (unless extremely serious) will not

---

[12] Establishing a hostile work environment claim requires the employee to have subjectively perceived the harassment as sufficiently severe and pervasive to alter the conditions of her employment and also, the perception must objectively reasonable. *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1246 (11th Cir. 1999) (citing *Harris v. Forklift Sys. Inc.*, 510 U.S. 17, 21-22 (1993)), *cert. denied*, 529 U.S. 1068 (2000). However, as defendant argues, the plaintiff's complaint does not state a separate claim for harassment. *See Palmer v. Albertson's LLC*, 418 Fed. Appx. 885, 889 (11th Cir. 2011) (finding a hostile work environment claim must be stated in a separate count from a disability discrimination claim). A plaintiff may not amend the complaint at the summary judgment stage by raising a new claim. *See Hurlbert v. Mary's Health Care Sys., Inc.* 439 F.3d 1286, 1297 (11th Cir. 2006). To the extent a harassment claim is considered raised or inferred from the discriminatory treatment claim, it fails on this record as a matter of law because the offending conduct was neither severe nor pervasive in Menzie's workplace, as discussed *infra*. Moreover, it is yet unclear whether such a claim exists under the ADA, as it has not been explicitly recognized by the Eleventh Circuit. *See Palmer*, 418 Fed. Appx. at 889 n.2 (stating, "[t]his Court has never held in a published opinion that a claim for harassment or a hostile work environment is available under the ADA," and declining to decide the issue); *Freeman*, 777 F. Supp.2d at 1277 & n.5 ("Given the lack of precedent in this circuit as to the existence of a disability-harassment claim under the ADA, this Court declines to recognize it today.").

amount to discriminatory changes in the terms and conditions of employment.'"[13] *Walton v. Johnson & Johnson Servs., Inc.*, 347 F.3d 1272, 1285 n. 12 (11th Cir. 2003) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998)), *cert. denied*, 541 U.S. 959 (2004). The court is mindful that "[t]he ADA, like Title VII of the Civil Rights Act of 1964, is not a general civility code" and "rudeness and other intangible mistreatment" must be "severe or pervasive" to give rise to a claim. *Ganstine v. Buss*, No. 4:11cv88-RH/WCS, 2011 WL 6780956, at *5 (N.D. Fla. 2011), *aff'd* 2012 WL 6699124 (11th Cir. 2012).

Ann Taylor argues that the record does not demonstrate Menzie's working conditions were rendered intolerable by this single incident. Menzie asserts that she has raised sufficient issues of fact to avoid summary judgment, arguing that the incident was sufficiently degrading because for approximately 45 minutes, Lang humiliated her based on her bipolar disorder and additionally, Lang reduced Menzie's hours and required Menzie to choose between accepting a demotion to sales associate or remaining in her position as sales lead with a 95% chance she would be terminated. Having fully and carefully reviewed the record, the court finds that even viewing the record in the light most favorable to Menzie, Lang's alleged conduct amounted to verbal harassment in a single incident with no witnesses that is objectively insufficiently serious to amount to a constructive discharge. Menzie cites no case law in which a constructive discharge occurred under the ADA based on a single incident of verbal harassment, and this court has found none. *See generally, EEOC v. Dillard's, Inc.*, 2009 WL 789976, at *13 (M.D. Fla. 2009) (stating, "[T]he Court is unaware of any case law finding a constructive discharge based on one event"). The court does not condone discriminatory or berating comments in the workplace based on a disability, such as Lang is alleged to have engaged in, but the court concludes that being called a liar, flighty, untrustworthy, or unfit for a sales lead position in a retail clothing store

---

[13] Single incidents that have been considered sufficiently severe have invariably involved allegations of sexual assault in the Title VII context. *See Walton*, 347 F.3d at 1285 n.2 (considering allegations of fondling and sexual assault to be extremely serious); *EEOC v. Dillard's, Inc.*, No. 6:07cv1496, 2009 WL 789976, at *8-9 (M.D. Fla. 2009) (an allegation of a single incident in which the assistant manager masturbated in front of the claimant in hopes he would watch was sufficiently severe); *see also Torres v. Pisano*, 116 F.3d 625, 631 n.4 (2nd Cir.) (noting a single episode of sexual harassment could be sufficiently severe to create an abusive working environment), *cert. denied,* 522 U.S. 997 (1997).

because of bipolar disorder is not the type of extremely severe conduct that would cause a reasonable person to feel compelled to resign without first giving the company any opportunity to rectify the situation.[14] While it is not inconceivable that one incident of severe treatment by a supervisor could justify a constructive discharge, the facts of this case are more akin to those cases in which courts have found the evidence insufficient to justify a constructive discharge claim. *See, e.g., Hipp*, 252 F.2d at 1233-34 (finding two instances of being verbally attacked in a public place and told to quit because he was unable to do the job and was doing a "terrible" and "lousy job" was not enough for constructive discharge); *Van Der Meulen v. Brinker Int'l*, 153 Fed. Appx. 649, 650 (11th Cir. 2005) (finding female worker was not constructively discharged as a result of one incident of sexual harassment by a supervisor); *Peters v. Comty. Action Comm., Inc. of Chambers-Tallapoosa-Coosa*, 977 F.Supp. 1428, 1436 (M.D. Ala.1997) (stating, "[a]lthough the number of incidents is not necessarily indicative of the intolerableness of an environment, an isolated confrontation with a superior," who had yelled at the plaintiff in front of other employees and came across a desk to meet her eye-to-eye, was "insufficient to support a conclusion of a constructive discharge").

Menzie cites *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000), in which a single incident of verbal harassment was deemed a viable harassment claim, but the circumstances of that case are distinguishable from this one. There, the one incident included loud, obscene comments made in public and in front of subordinates about the plaintiff and her competence in a firefighting profession, where success in saving lives and property depends on "unquestioning execution of line-of-command orders in emergency situations," with the potential effect of diminishing respect by subordinates in a manner that could impair her ability to lead in life-threatening circumstances. *Id.* Here, by contrast, the

---

[14] Verbal misconduct based on an employee's protected status is not even always considered sufficiently severe to demonstrate harassment. *See, e.g., Mosley v. MeriStar Mgm't, LLC*, 137 Fed. Appx. 248, 252 n. 3 (11th Cir. 2005) (noting two incidents of racial epithets would have been insufficiently severe to support a hostile work environment claim); *EEOC v. WC&M Enter., Inc*., 496 F.3d 393, 300-400 (5th Cir. 2007) (stating, although a "sufficiently severe" single incident of harassment could give rise to a viable claim, it was not enough to demonstrate the claimant was mocked by a supervisor, co-worker, and manager on the basis of his religion and national origin).

Case No. 3:11cv416/MCR/CJK

berating speech occurred in private, not in front of other employees, subordinates, or customers, and it was not threatening in nature. Even Menzie admits that Lang offered to let her stay in the same position of sales lead position, on the condition that she show improvement in her performance, and Menzie requested no accommodation for her disability. The fact that she was told of a 95% chance she would be fired if she remained a sales lead is itself too speculative to be considered an adverse action; to consider this warning an adverse action would "encourage speculative litigation and discourage employees and employers from resolving their differences from within the employment relationship," which the Eleventh Circuit has cautioned against. *Fitz v. Pugmire Lincoln-Mercury, Inc.*, 348 F.3d 974, 978 (11th Cir. 2003). Even if Menzie may have perceived her only option to be resignation, her subjective feelings are not at issue in a constructive discharge claim.[15] *See Doe*, 145 F.3d at 1450. Considering the record as a whole in the light most favorable to Menzie, the one incident complained of here, while harassing and degrading (assuming, as the court must at this stage of the proceedings, that the incident occurred in the manner described by Menzie), was not pervasive in the work place and does not itself meet the level of objective substantiality necessary to be considered so intolerable that there could be a question of fact over whether a reasonable person would have felt compelled to resign.

Also, the record does not support Menzie's contention that she suffered an adverse action because her hours were reduced.[16] "A reduction in an employee's hours, which reduces the employee's take-home pay, qualifies as a tangible employment action."

---

[15] Moreover, although the employee's subjective impressions are not necessary to the constructive discharge analysis, the record shows that Menzie herself did not feel the situation warranted her immediate resignation. She knew she could have stayed in the same position but she nevertheless accepted the sales associate position and did not decide to quit because of the incident with Lang until others offered to help her find another job or advised her to quit.

[16] Menzie did not include this as a factual averment in her complaint, but relies on it in response to the summary judgment motion. Moreover, she never claimed or suggested that Marcus engaged in discrimination by assigning her to work a 12-hour week until her response to the summary judgment motion. The complaint gave no notice that an adverse action based on a reduction in hours was claimed. *See Ganstine v. Sec. Fla. Dep't of Corr.*, 2012 WL 6699124, at * 3 (11th Cir. 2012) (refusing to consider an ADA violation, or consider a new theory, raised in response to summary judgment because the complaint had not been amended).

*Cotton v. Cracker Barrel Old Country Store, Inc.*, 434 F.3d 1227, 1231 (11th Cir. 2006). However, where the record shows that no employee was entitled to any particular shift or number of hours, or where a reduction was for a single week with no evidence that it would last longer or lead to a loss of benefits, it cannot be considered *materially* adverse. *See Cham v. Station Operators, Inc.*, 685 F.3d 87, 94-95 (1st Cir. 2012) (rejecting "out of hand" the "extreme argument that a one-week reduction amounts to a constructive discharge"). The record here shows that all sales leads worked variable part-time hours within the same range as Menzie's. Menzie presented no evidence that she was guaranteed any certain number of hours and there is no evidence to suggest that her hours were materially and permanently reduced or that her benefits were impacted by any fluctuation in her hours. The alleged reduction in hours on the schedule for one or two particular weeks cannot be considered a materially adverse employment action on this record. Therefore, although factual disputes are present on this record, Menzie has failed to establish or create a genuine dispute of material fact as to *all* necessary elements of her claim of discriminatory treatment.

Moreover, even if the "discriminatory tirade" could be considered objectively severe, an employer may defend against a constructive discharge claim by showing it had a policy for reporting and resolving complaints and that the plaintiff unreasonably failed to avail herself of those procedures; *except,* this defense is not available "if the plaintiff quits in a reasonable response to an *employer-sanctioned* adverse action officially changing her employment status or situation." *Bryant*, 575 F.3d at 1299 (internal marks omitted); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761-65 (1998) (requiring a "significant change in employment status"); *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998). An employer-sanctioned adverse action could include, "'for example, a humiliating demotion, extreme cut in pay, or transfer to a position in which she would face unbearable working conditions.'" *Bryant*, 575 F.3d at 1299 (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004)). Here, the alleged "discriminatory tirade" was a private act of a supervisor, which the court has already concluded was not an employer-sanctioned adverse action. No employer-sanctioned adverse action officially changed her employment

status.  As noted above, she was given the option to continue on as a sales lead, conditioned only on her improved job performance, and the record does not support her contention that her hours were officially reduced.  Therefore, absent an officially-sanctioned adverse action, the *Ellerth/Farragher* affirmative defense is available to the employer.  *See Suders*, 542 U.S. at 148.  Plaintiff cannot defeat this defense because it is undisputed that she failed to take advantage of the company's procedures.  The Eleventh Circuit has stated, "[p]art of an employee's obligation to be reasonable is an obligation not to assume the worst, and not to jump to conclusions too fast."  *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987).  Menzie's assertion that she was unaware of the policy is contradicted by her initials on forms required to be completed prior to her first day of employment acknowledging the policies and her admissions in her personal journal that she sought the advice of counselors, the Advocacy Center Persons with Disabilities, the ACLU, the Human Rights Commission, and lawyers before quitting.  Menzie is therefore unable to avoid the defense that she unreasonably failed to take advantage of the employer's procedures.

Accordingly, the defendant's motion for summary final judgment (doc. 49) is GRANTED.  The Clerk is directed to tax costs against the plaintiff and close the file.

**DONE and ORDERED** this 27th day of February, 2013.

*M. Casey Rodgers*
**M. CASEY RODGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**